UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| MICHAEL P. LOTIEF | CIVIL ACTION |
| VERSUS | |
| | NO. 18-991-JWD-EWD |
| BOARD OF SUPERVISORS FOR THE UNIVERSITY OF LOUISIANA SYSTEM D/B/A/ UNIVERSITY OF LOUISIANA AT LAFAYETTE, ET AL. | |

## RULING AND ORDER

Pending before the Court is the Motion to Transfer Venue filed by Defendants Board of Supervisors for the University of Louisiana System, E. Joseph Savoie, Jessica Clarke Leger, and Bryan Maggard (collectively, "the defendants"). (Doc. 7). Plaintiff Michael P. Lotief opposes the motion. (Doc. 12). The defendants have filed a reply brief in support of their motion. (Doc. 14). Oral argument is not necessary. After careful consideration of the parties' arguments, the facts alleged, and the applicable law, and for the following reasons, the Motion to Transfer Venue (Doc. 7) is granted and this matter is transferred to the United States District Court for the Western District of Louisiana.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following is a recitation of the facts alleged in Plaintiff Michael Lotief's state-court petition. Lotief resides in Lafayette Parish, Louisiana, and was head coach of the women's softball team at the University of Louisiana at Lafayette from 2003 until he was terminated on November 1, 2017. (Doc. 1-1 at 8–13). On September 20, 2018, he brought suit in the 19th Judicial District Court for the Parish of East Baton Rouge against the Board of Supervisors for the University of Louisiana System ("Board") doing business as the University of Louisiana at Lafayette ("ULL"),

ULL President E. Joseph Savoie, ULL Athletics Director Bryan Maggard, and ULL Deputy Athletics Director Jessica Clarke Leger. (*Id.* at 1). ULL itself is located in Lafayette Parish, while the Board is domiciled in East Baton Rouge Parish. (*Id.*). Savoie, Maggard, and Leger are all residents of Lafayette Parish. (*Id.*).

During Lotief's tenure as head coach, he "became aware of the inequities and discrimination between female and male athletics at ULL" and voiced his concerns to Leger, Maggard, and Savoie. (Doc. 1-1 at 17). Despite raising his concerns, "the inequities and gender based discrimination continued." (*Id.*). Additionally, Lotief documented in writing various instances of discrimination against female athletes and provided these writings to Leger, Maggard, and Savoie. (*Id.*). The alleged discrimination included inequities with respect to medical care, playing facilities, office space, training, pay for coaches and staff, and funding, among other things. (*Id.* at 17–19).

ULL ultimately terminated Lotief in November 2017 purportedly for three incidents: "using vulgar and offensive language" on the team bus after a game in College Station, Texas, in April 2017, a similar incident involving language after a game at Louisiana State University in Baton Rouge, Louisiana, in June 2017, and allegedly "poking" a strength coach in the weight room at ULL in October 2017. (Doc. 1-1 at 19–20). Lotief alleges that comparable instances involving men's athletic teams at ULL did not result in the termination of any coaches. (*Id.*). He claims that Leger "manipulated" a former student-athlete into filing a complaint against Lotief on August 2, 2017. (*Id.* at 21–22). Leger allegedly directed the former athlete to contact three players to corroborate her complaint and "undermine Lotief and the student-athletes Leger was supposed to be serving." (*Id.* at 22–23). Lotief alleges that if the allegations against him had merit, Leger would have been required to start an investigation; however, she failed to do so and on August 22,

2

2017, recommended approval of a $21,000 bonus for Lotief. (*Id.* at 23). Maggard and Savoie also approved the bonus and "expressed vocally their support for Lotief" at a dinner for the team on August 21. (*Id.* at 24).

On October 29, 2017, the softball team signed a statement stating that the investigation into Lotief's conduct was "unjust," and that ULL administration was "intimidating players [and] lying about the ongoing investigation." (Doc. 1-1 at 28). The statement provided that the complaints of a hostile environment were "untrue" and that "there was instead a competitive environment holding the team to championship standards." (*Id.*). Finally, the statement affirmed "the team's belief that Lotief was being targeted and retaliated against for standing up for female athletes, and indicated the team's belief that they were being treated unequally because of their gender." (*Id.*). Additionally, when Sara Corbello[1] presented Savoie with statements from the team in favor of Lotief and "evidence exonerating" him, Savoie "immediately ordered that Corbello be fired." (*Id.*).

Savoie, Maggard, and Leger ignored the "exculpatory statements, documents, and evidence," while Savoie "ordered the false, incomplete HR [investigative] report to be released to the public." (Doc. 1-1 at 29–30). In October 2017, Lotief spoke with Deputy Athletics Director Nico Yantko "about the severely disparate treatment of female athletics as compared to men's athletics." (*Id.* at 33). In response, Yantko became "defensive" and "attempted to intimidate Lotief into submission by hitting Lotief in his chest with the back of his hand, and moving in closer and closer towards Lotief as the conversation continued." (*Id.*).

When ULL terminated Lotief, it published a press release stating, "Lotief violated ULL and [University of Louisiana] System policies by subjecting student-athletes and coworkers to violent, vulgar language and verbal and physical assault, creating a hostile learning and working

---

[1] The petition does not state Corbello's position at ULL.

environment." (Doc. 1-1 at 37). Lotief alleges that "[t]his press release was false, defamatory, and slanderous and known to be so by the Defendants." (*Id.*). The fact that ULL released this information to the public without including information favorable to Lotief "is further evidence of ULL's malicious intent." (*Id.*). So too was Savoie's decision to fire Lotief yet retain coaches of various men's teams for what Lotief alleges are similar incidents of alleged misconduct. (*Id.*).

Lotief alleges that ULL's stated reason for terminating him was pretextual. (Doc. 1-1 at 38). Instead, he maintains that ULL terminated him for "reporting numerous forms of gender discrimination as well as the unequal treatment of female athletes as compared to male athletes." (*Id.*). "After Lotief's engagement in this protected activity [under Title IX of the Education Amendments of 1972] increased, ULL began its attempt to silence and ultimately terminate him by accumulating false and misleading evidence to support their [sic] ultimate decision." (*Id.*). Lotief additionally alleges that ULL defamed him by "actively propagate[ing] false, misleading, and damaging information through various local news sources following Lotief's termination in an attempt to publically [sic] discredit and humiliate him." (*Id.* at 40–41). "ULL falsely accused Lotief of being verbally, physically, and emotionally abusive to softball players as well as employees of ULL." (*Id.* at 41). Lotief also alleges that ULL's conduct violated his rights under the First Amendment, Fourteenth Amendment, and the Americans with Disabilities Act. (*Id.* at 43–47).

Additionally, Lotief brings state-law claims for wrongful conversion of property and breach of contract. (Doc. 1-1 at 47–49). In support of his conversion claim, Lotief alleges that while he was on administrative leave on October 6, 2017, he was locked out of ULL's softball facilities without access to his personal property. (Doc. 1-1 at 47). Lotief asserts that ULL still possesses and refuses to return his "family pictures, memorabilia, his notary seal, his prescription

sunglasses, his most valuable autographed photo of Mother Theresa and Father Brennan, multiple pictures of [his] deceased dad with family members, and family heirlooms." (*Id.*). Lotief also claims that he spent over $120,000 in equipment for the ULL softball team, which has not been returned. (*Id.* at 47–48). Despite attempting to recover the property, ULL has not returned all of it, and instead "engages in multiple piecemeal deliveries to the Lotief's [sic] storage unit[.]" (*Id.* at 48). "[T]o this day," the university is still in possession of "numerous pieces of equipment, personal items, and documents which belong to Lotief." (*Id.*). ULL is also in possession of "roughly" $20,000 worth of softball equipment used by Lotief for a summer camp program. (*Id.*).

Lotief's breach-of-contract claim arises out of a "contract which . . . may be evidenced in writing but is otherwise at least oral and which guaranteed a minimum term of employment." (Doc. 1-1 at 48). He alleges that he had five years remaining on his employment contract after winning a regional tournament. (*Id.* at 49). ULL's decision to terminate his employment constitutes a breach of the employment contract. (*Id.*).

## II. DISCUSSION

The Court notes at the outset of this discussion that venue is proper in the Middle District of Louisiana. In federal court, venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1).[2] Here, the Board of Supervisors for the University of Louisiana System is the managing body of ULL and is domiciled in East Baton Rouge Parish, which is located in the Middle District of

---

[2] Additionally, Lotief's ADA claim is governed by 42 U.S.C. § 2000e-5(f)(3), which provides that venue for an ADA claim is proper in any district in the state "in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice[.]" Accordingly, based on Lotief's allegations, venue for Lotief's ADA claim is proper in the Middle District of Louisiana.

5

Louisiana. As all of the individual defendants are residents of Louisiana according to Lotief's allegations, venue is proper in this district.

This, of course, does not end the Court's inquiry. The federal venue transfer statute provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought[.]" 28 U.S.C. § 1404(a). Because all of the individual defendants reside in Lafayette Parish, which is located in the Western District of Louisiana, and "a substantial part of the events or omissions giving rise" to Lotief's suit occurred there, venue in the Western District is also proper.[3] Under § 1404(a), a motion to transfer venue should be granted if "the movant demonstrates that the transferee venue is clearly more convenient." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) ("*Volkswagen II*"). While deference is given to the plaintiff's choice of venue, a movant need only show "good cause" to prevail on a motion to transfer. *Id.* That is, the movant must "satisfy the statutory requirements and clearly demonstrate that a transfer" meets the § 1404 threshold of convenience and serves the interest of justice. *Id.*

In the Fifth Circuit, courts apply a host of public and private interest factors established by the Supreme Court in *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501 (1947), to determine "whether a § 1404(a) venue transfer is for the convenience of parties and witnesses and in the interest of justice." *Volkswagen II*, 545 F.3d at 315. The private interest factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). The public interest factors are: "(1) the administrative

---

[3] All of the requirements set forth in 42 U.S.C. § 2000e-5(f)(3) are satisfied by venue the Western District of Louisiana; thus, venue in the Western District for Lotief's ADA claim is also proper.

6

difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or] the application of foreign law." *Id.* While they illuminate the convenience inquiry, these factors "are not necessarily exhaustive or exclusive," and "none can be said to be of dispositive weight." *Volkswagen II*, 545 F.3d at 315 (internal quotation marks omitted).

A.  **Private Interest Factors**

When applied to Lotief's factual allegations, the *Gilbert* factors point inexorably to the Western District of Louisiana as the more convenient forum for this lawsuit. Beginning with the private interest factors, the Court disagrees with Lotief's arguments and concludes that three of the four factors weigh strongly in favor of transfer.

1.  **Ease of Access to Sources of Proof**

While access to certain sources of proof as a factor may not have the import it used to, the Fifth Circuit has reminded courts that it remains a "meaningful factor" in the § 1404(a) analysis. *Volkswagen II*, 545 F.3d at 316. The defendants point out that because Lotief's suit arises out of his employment at ULL, all of his employment files as well as the investigatory materials cited to in the petition are located at ULL's offices in Lafayette. (Doc. 7-1 at 5). The defendants also assert that the "physical evidence," like the facilities Lotief alleges are inadequate and the property he asserts was converted, are also located at ULL. (*Id.*). In response, Lotief argues that "copies of relevant documents are housed at the Board's offices in Baton Rouge" and evidence related to ULL facilities "would be introduced in the exact same manner whether or not trial went forward in the Middle or Western District." (Doc. 12 at 4).

This factor weighs plainly in favor of transfer. Based on the allegations in Lotief's petition, his sources of proof at trial—witnesses, documents, and physical evidence—are either predominantly or exclusively located in Lafayette. *See, e.g.*, *Volkswagen II*, 545 F.3d at 316 (finding this factor weighed in favor of transfer to a different division where "[a]ll of the documents and physical evidence" related to the accident at issue were located in the transferee division). And while Lotief makes much of the Board's domicile in East Baton Rouge Parish, claiming that copies of relevant documents are located at its offices there, he has failed to point to *any* specific document existing in only in Baton Rouge that is crucial—or even relevant—to his case. The Court cannot simply presume that copies of all relevant documents exist at the Board's offices in Baton Rouge merely because the Board is domiciled there. Without any such showing, the Court concludes that the access-to-proof factor weighs decisively in favor of a transfer to the Western District—where most or all of Lotief's proof is currently located.

### 2. Securing Attendance of Witnesses

As the parties admitted in briefing, this factor is neutral because of the Western District and Middle District's coextensive subpoena power over witnesses located either in Baton Rouge or Lafayette. *See* Fed. R. Civ. P. 45(c)(1)(A) ("A subpoena may command a person to attend a trial, hearing or deposition . . . within 100 miles of where the person resides, is employed, or regularly transacts business in person[.]").

### 3. Witnesses' Cost of Attendance

The defendants point out that "[a]ll known fact witnesses are current or former [ULL] employees or softball players," at least the majority of whom reside or work in the Lafayette area, and argue that it "would be inconvenient and burdensome for them to travel to Baton Rouge for trial." (Doc. 7-1 at 6). The defendants also note that they are unaware of any witnesses residing

8

or working in Baton Rouge with the exception of a few individuals who may have been witness to an incident between Lotief and the Louisiana State University grounds grew—one of several stated justifications for Lotief's termination according to his allegations. (*Id.*).

Citing to *Volkswagen I*, Lotief counters that "the less than sixty mile drive from Lafayette to Baton Rouge is not a distance that will cause the type of inconvenience warranting a transfer as contemplated by § 1404" given *Volkswagen I's* emphasis on the inconvenience to witnesses imposed by a distance of greater than 100 miles. (Doc. 12 at 5); *see also Volkswagen I*, 371 F.3d at 204–05. Lotief also asserts that Savoie and other ULL administrators regularly travel to Baton Rouge in the course of their employment, and that he plans to "depose and/or call as witnesses" members of the Board "who are all located in Baton Rouge or routinely travel to Baton Rouge." (*Id.*). Lotief also asserts that "all depositions could take place in Lafayette," many of the softball players who could serve as witnesses have filed their own lawsuit in the Middle District, "clearly demonstrat[ing] that a large number of witnesses have no problem participating in a lawsuit in Baton Rouge." (*Id.* at 5). Moreover, Lotief argues, "flying into Baton Rouge is much easier than flying into Lafayette" for out-of-state witnesses. (*Id.* at 6).

Lotief's argument misses the mark for several reasons. The essence of his argument is that because Lafayette and Baton Rouge are not a significant distance from each other, it makes little difference whether his case is tried in the Western District or Middle District. Such an argument minimizes the importance and purpose of geographical boundaries for federal district courts as well as one of the public interest factors—"the local interest in having localized controversies decided at home." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 63 n.6 (2013) (internal quotation marks omitted). And, importantly, the Fifth Circuit has clarified that it never implied that "transfer within 100 miles does not impose costs on witnesses

9

or that such costs should not be factored into the venue-transfer analysis[.]" *In re Radmax*, 720 F.3d 295, 289 (5th Cir. 2013). Moreover, that certain witnesses may occasionally travel to Baton Rouge for work or have filed a related lawsuit in the Middle District does not inform the question of whether it is more convenient for these witnesses to attend court proceedings at the Western District courthouse in Lafayette. And Lotief offers no citation or further elaboration for his statement that it would be "easier" for out-of-state witnesses to fly into Baton Rouge than Lafayette. Thus, the Court cannot consider this broad and sweeping statement in its analysis of the most convenient forum for Lotief's suit.

Indeed, as the defendants point out, the difference for the vast majority of the potential witnesses who reside in the Lafayette area between attending proceedings in the Western District and Middle District could be substantial. (*See* Doc. 14 at 3). ULL, where many potential witnesses are either enrolled as students or employed, is located approximately one mile (a five-minute drive) from the Western District courthouse in Lafayette. *See* Driving Directions from University of Louisiana at Lafayette to U.S. District Court, GOOGLE MAPS, https://www.google.com/maps (follow "Directions" hyperlink; then search "University of Louisiana at Lafayette" to "U.S. District Court, Lafayette, LA"). Conversely, it is located 57 miles from the Middle District Courthouse—a one-hour drive without significant traffic. (*See* Driving Directions from "University of Louisiana at Lafayette" to "U.S. District Court, Baton Rouge, LA"). And the Court would be remiss not to note the perils imposed by frequent traffic jams, vehicle accidents, and road construction on Interstate 10, all of which can make the otherwise one-hour drive a significantly lengthier and more complicated journey.

"Additional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays

increases the time which these fact witnesses must be away from their regular employment." *Volkswagen I*, 371 F.3d at 205. While Lafayette and Baton Rouge are admittedly within relatively close proximity, they sit in different federal districts for a reason, and Lotief has failed to direct the Court to any key witnesses for whom travel to Lafayette instead of Baton Rouge would be less convenient. Accordingly, the Court finds the cost-to-witnesses factor to weigh in favor of transfer to the Western District of Louisiana. *See, e.g.*, *Frederick v. Advanced Fin. Sols., Inc.*, 558 F. Supp. 2d 699, 704 (E.D. Tex. 2007) ("When nearly all of the nonparty witnesses that will testify concerning disputed issues reside elsewhere, this factor weighs in favor of transferring the case.").

    4.    **Other Practical Considerations**

The final private interest factor asks for an examination into "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen I*, 371 F.3d at 203. Without citation, Lotief asserts that trial of his lawsuit in the Western District would not be "any more easy, expeditious, and/or inexpensive" than trial in the Middle District. (Doc. 12 at 6). He additionally argues that trial in the Western District could be complicated by the extensive media coverage of the case in Lafayette. (*Id.*). The Court finds this argument to be logically inconsistent with Lotief's general contention that trial in the Middle District would not be inconvenient because of its relatively close proximity to the Western District. Lotief cannot on one hand argue that Baton Rouge and Lafayette are close enough to mitigate any significant inconvenience, while on the other maintain that a Western District jury would likely be tainted by the extensive media coverage while a Middle District jury would be oblivious to the issues underlying his suit.

Nevertheless, any concern over jury bias would be mitigated by *voir dire* questions concerning any potential juror's connection to ULL or exposure to relevant media coverage, as well as cautionary instructions prohibiting jurors from conducting any outside research into the

case. As Lotief's allegations center on conduct that occurred in the Western District, the majority of potential witnesses reside in the Western District, and the majority of potential evidence is located there, it is clear that a trial in the Western District would be easier, more expeditious, and less expensive than a trial in the Middle District.

**B.    Public Interest Factors**

    **1.    Court Congestion**

In an effort to keep his suit in the Middle District, Lotief references the Western District's period of judicial emergency status based on a previous shortage of District Judges. (Doc. 12 at 7). He asserts that while new District Judges in the Western District are "diligently working to clear up congestion" there, "it would be far less burdensome to proceed with trial in the Middle District where similar congestion issues are not present." (*Id.*).  The Court disagrees.

The Middle District enjoys a high case load and a heavily congested docket.  In fact, earlier this year, it was named the fourth busiest district in the United States based on "weighted filings." *Middle District of Louisiana is Nation's 3rd Most Productive U.S. District Court*, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA, https://www.lamd.uscourts.gov/news/middle-district-louisiana-3rd-most-productive-us-district-court-feb2019 (last visited July 29, 2019).  At the end of 2008, the Middle District had a total of 2,096 pending civil cases for a Court of three District Judges. *Id.*  Accordingly, and contrary to Lotief's contentions, the Court finds that trying Lotief's suit in the Middle District would be more burdensome than trying the case in the Western District.  Thus, this factor favors transfer.

    **2.    Local Interests**

The defendants assert that a Western District jury has a local interest in deciding this case because the suit arises out of Lotief's employment at ULL, and a "Lafayette jury" has an interest

in deciding a case centered on its local university. (Doc. 7-1 at 7–8). Lotief counters that a Middle District jury has a localized interest in deciding a suit against the Board because it is domiciled in East Baton Rouge Parish. (Doc. 12 at 8). He also asserts that the Middle District and Western District are "adjacent to each other" and have "shared localized interests in seeing Louisiana Universities being held accountable for Title IX violations," as each public university in the University of Louisiana System is ultimately accountable to the "Board and System President." (*Id.*). Finally, Lotief cites to *Wallace v. Board of Supervisors for the University of Louisiana System* for the proposition that "it is possible for multiple districts to have a localized interest in a single cause of action, particularly when the districts are geographically adjacent and the communities regularly travel between them." Civil Action No.14-657-SDD-RLB, 2015 WL 1970514, at *7 (M.D. La. Apr. 30, 2015).

Despite Lotief's contention, the fact that the districts were adjacent was not the *Wallace* court's only consideration, and the facts in that case are easily distinguishable from those here. *Wallace* centered on allegations against Southeastern Louisiana University, which is located in the Eastern District of Louisiana. *Wallace*, 2015 WL 1970514, at *1. However, the *Wallace* court was careful to point out that Southeastern Louisiana University is located 60 miles from the Eastern District courthouse in New Orleans and just 48 miles from the Middle District courthouse in Baton Rouge. *Id.* at *6. Thus, it was actually closer for several witnesses in that case to travel to the Middle District courthouse than to the Eastern District courthouse. *Id.* Moreover, because the university was located in a parish directly adjacent to the Middle District, "its influence [was] felt in both the Eastern and Middle Districts, considering students and employees hale[d] from both districts and [were] equally affected by the enforcement of non-discriminatory policies." *Id.* at *8.

13

Further, the university in *Wallace* operated satellite campuses in the Middle District. *Id.* Thus, "residents of both districts [had] a localized interest in the resolution of [the] dispute." *Id.*

Conversely, Lafayette Parish is not directly adjacent to the Middle District, and Lotief has made no showing that ULL's influence is equally felt in both districts. ULL has no satellite campuses in the Middle District and it is clear that, for at least a substantial majority of fact witnesses, the Western District courthouse is significantly closer and more convenient than the Middle District courthouse. Lotief has pointed to no significant ULL student or employee population in the Middle District such that jurors in this district would have a localized interest in resolving this dispute. And Lotief's argument that a Middle District jury would have a localized interest in resolving claims against the Board is unavailing. Such an argument would, brought to its logical conclusion, imply that a Middle District jury has a localized interest in adjudicating a lawsuit against any school in the University of Louisiana System—including those hundreds of miles and several hours away from the Middle District. "Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gilbert*, 330 U.S. at 508–09. As most of the parties and witnesses reside in the Western District, and the conduct giving rise to suit occurred at ULL, "the local interest in having localized interests decided at home weighs heavily in favor" of transfer to the Western District of Louisiana. *Volkswagen I*, 371 F.3d at 206 (citation and internal quotation marks omitted).

### 3. Governing Law

As both the Western District and Middle District sit within the state of Louisiana and regularly apply Louisiana law in the adjudication of their cases, both districts are equally familiar with Lotief's state-law theories of liability. And both forums are certainly on equal footing with respect to the federal law governing Lotief's suit. Accordingly, this factor is neutral.

4. **Conflict of Laws**

Based on Lotief's theories of liability, there are no conflict-of-laws issues, and this case will not require the application of foreign law. Thus, this factor is also neutral.

### III. CONCLUSION

This lawsuit arises out of Lotief's employment with ULL in the Western District, includes allegations of conduct that took place almost exclusively in the Western District, will require production of documents and witnesses that are located primarily in the Western District, and is asserted against one of the largest employers in Lafayette. *Lafayette Parish Economic Profile*, ONE ACADIANA, https://www.oneacadiana.org/lafayette-parish (last visited July 30, 2019). Accordingly, it is both more convenient for the parties and witnesses and in the interest of justice that this case be transferred to the Western District of Louisiana.

For the foregoing reasons, **IT IS ORDERED** that the Motion to Transfer Venue (Doc. 7) is **GRANTED**, and this matter is transferred to the United States District Court for the Western District of Louisiana.

Signed in Baton Rouge, Louisiana, on July 31, 2019.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**